## PANHANDLE EASTERN PIPE LINE CO. v. FEDERAL POWER COMMISSION (two cases).

### Nos. 10639, 10761.

United States Court of Appeals Third Circuit.

Argued Jan. 6, 1953.

Decided April 30, 1953.

Rehearing Denied June 9, 1953.

McLaughlin, Circuit Judge, dissented.

See, also, 204 F.2d 925.

Harry S. Littman, Washington, D. C., John S. L. Yost, New York City (Scott & Littman, Washington, D. C., Baker & Daniels, Indianapolis, Ind., Steptoe & Johnson, Washington, D. C., on the brief), for petitioner.

Lawrence R. Brown, Kansas City, Mo. (Paul R. Stinson, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., on the brief), for Central West Utility Company, intervenor.

Robert L. Russell, Washington, D. C. (Bradford Ross, Gen. Counsel, Bernard A. Foster, Jr., Asst. Gen. Counsel, Francis J. Walsh, Atty. Federal Power Commission, Washington, D. C., on the brief), for Federal Power Commission.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

Panhandle Eastern Pipe Line Company in the consolidated petitions for review now before us asks this court to set aside the same two orders of the Federal Power Commission which were involved in the two consolidated petitions for review filed by Michigan Consolidated Gas Company which we have just decided. Michigan Consol. Gas Co. v. Federal Power Comm., 3 Cir., 203 F.2d 895. The basic facts with respect to the orders in controversy are set out at length in our opinion in those cases and need not be repeated here.

The petition filed by Panhandle to No. 10,639 seeks review of the order accompanying Opinion No. 218 of the Commission insofar as it directs Panhandle within 45 days to take steps to increase the capacity of its lateral pipeline running from Louisburg, Kansas, to Liberty, Missouri, sufficiently to eliminate what the Commission found to be discrimination against customers on that pipeline, by making. it possible to provide them with the maximum volume of natural gas to which the Commission found they were fairly entitled. The petition also sought other relief not now pertinent. The Liberty lateral had been built in 1928 and had been later acquired by Panhandle. It is a comparatively low pressure pipeline and the maximum volume of gas which Panhandle had been able to deliver through it in a peak day was 20,925 Mcf of which 7,741 Mcf was delivered to Central West Utility Company and 10,220 Mcf to Gas Service Company, a total of 17,961 Mcf to those two companies.

Pursuant to Opinion No. 214 Panhandle had contracted with several of its customers for gas to be delivered from the Liberty lateral but had declined to contract with Central West and Gas Service. These two customers had filed sworn statements, as authorized by Opinion No. 214, requesting maximum daily deliveries from the Liberty lateral aggregating 27,375 Mcf. These requests, if acceded to by Panhandle, would have required a maximum daily delivery from the Liberty lateral of upwards of 30,000 Mcf, approximately 50% in excess of its existing capacity.

In the case of certain other lateral pipelines in the Panhandle system, Panhandle had contracted with customers for the delivery of maximum volumes of gas in excess of the existing capacity of the particular lateral and had, with the approval of the Commission, taken steps to increase the capacity of the lateral so as to meet the obligations to its customers thus undertaken.[1] In the case of the Liberty lateral, however, Panhandle has declined to do so, taking the position that the enlargement of that lateral sufficiently to meet the demands of Central West and Gas Service would involve the unwarranted investment of a large amount of additional capital which it does not wish to devote to that purpose. In fact Panhandle had made application for leave to abandon its deliveries to Gas Service altogether and that application was pending when the orders here in controversy were made. The Commission, however, in Opinion No. 218 concluded that "Panhandle's failure and refusal to afford customers served from various lateral facilities the same or similar service constitutes unlawful discrimination in service among customers, and undue preference and advantage to some customers and undue prejudice and disadvantage to others." Accordingly the Commission entered the order directing Panhandle to take appropriate steps within 45 days to eliminate this discrimination which its first petition to review seeks to set aside.

The petition filed by Panhandle to No. 10,761 seeks to review the order issued by the Commission on March 5, 1952 insofar as it requires Panhandle to deliver to its customers a maximum daily volume of gas in excess of 850,000 Mcf, the approved capacity of its pipeline system, and to its customers on the Liberty lateral a maximum daily volume in excess of the capacity of that lateral. Pursuant to Opinion No. 214 Panhandle ultimately entered into contracts with all but four of its customers. These contracts called for the ultimate delivery of maximum daily amounts of gas aggregating 811,634 Mcf. The four customers, Michigan Consolidated Gas Company, Gas Service Company, Texas Gas Transmission Corporation and Central West Utility Company, had filed demands for gas aggregating 275,000 Mcf per day in respect of which there had been allocated to them by Opinion No. 218 maximum daily deliveries aggregating 196,049 Mcf. The total ultimate maximum daily delivery of gas thus contracted for by Panhandle's customers plus the amounts prescribed by the Commission for the four customers with which contracts had not been made thus totaled 1,007,683 Mcf, which was 157,683 Mcf in excess of the designed and approved capacity of Panhandle's pipeline system.

In Opinion No. 218 the Commission determined that Panhandle's designed capacity would be insufficient to meet the firm requirements of its customers during the winter 1951–1952. It accordingly allocated Panhandle's system capacity among its customers prescribing the minimum daily volumes which Panhandle would be required to deliver when the requirements of the customers exceeded 850,000 Mcf. In its order issued March 5, 1952 this allocation was made effective until March 31, 1952. The Commission reiterated the statement

1. In Opinion No. 218 the Commission found that Panhandle had discriminated against its customers on both the Liberty and the Peoria laterals. In the case of the Peoria lateral after the filing of Opinion No. 218 on August 31, 1951 Panhandle executed service agreements with its customers served from that lateral and later proposed to increase its capacity to the extent necessary to serve them. That lateral is accordingly not presently involved.

made in Opinion No. 218 that "The Commission does not expect, nor does it now intend, to issue further orders allocating the capacity of Panhandle's pipe-line system during ensuing winter periods." By that order the Commission put into force as of February 20, 1952 the service agreements which Panhandle had made with its 47 customers as well as the allotments of gas made by the Commission to the four noncontracting customers. Thereby the Commission in effect directed Panhandle for the winter 1952–1953 and thereafter until further order to deliver to its customers upon demand the full maximum amounts of gas called for by the contracts and by the order with respect to the four noncontracting customers, which in the fifth year of the contracts would aggregate 1,007,683 Mcf per day.

The Commission took the view that, since Panhandle had contracted with 47 customers for the delivery of their requirements totaling ultimately a maximum of 811,634 Mcf per day, it would be unduly prejudicial to and unreasonably discriminatory against the four remaining customers and, therefore, in violation of the Act for Panhandle to refuse them also their reasonable requirements. Accordingly the Commission directed Panhandle to continue in force the prior contracts of these four customers modified as provided by its orders for the delivery of maximum daily amounts of gas aggregating 196,049 Mcf. It is clear that

in so doing the Commission has required Panhandle to deliver gas substantially in excess of the designed capacity of its pipeline system. The Commission contends that it is nonetheless Panhandle's duty under section 4(b) of the Act, 15 U.S.C.A. § 717 c(b), to do so in order to accord to its noncontracting customers the same treatment which it has under its contracts voluntarily accorded its other customers. While the Commission does not say so its position necessarily implies a duty on the part of Panhandle to enlarge its pipeline facilities, if it is necessary to do so to carry out its duty in this regard.

It will thus be seen that both petitions for review present the same basic question, namely, whether, in the case of a natural gas company which has engaged in undue discrimination by agreeing to deliver to one group of customers a larger proportion of their reasonable requirements than it is able, because of limited pipeline facilities, to deliver to other customers similarly situated, the Act empowers the Commission, for the purpose of eliminating the discrimination, to order the company to deliver to its customers substantially more gas than its pipeline system is designed to carry, thereby necessarily requiring the company involuntarily to enlarge its gas transportation facilities. In considering this question we assume, without deciding, that Panhandle was guilty of undue discrimination against its four noncontracting customers, in violation of sections 4(b) and 5(a) [2] of

2. "Sec. 4. * * *

"(b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 15 U.S.C.A. § 717c(b).

"Sec. 5. (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any nat-

ural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however*, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a

the Act, in agreeing to deliver all but about 39,000 Mcf [3] per day of the capacity of its pipeline system to the other customers with which it had contracted. Also we note that under section 5(a) of the Act, the Commission is empowered to eliminate such undue discrimination as this by directing, as it did in Opinion No. 218 with respect to the winter 1951–1952, that the maximum amounts of gas to be delivered to the contracting customers shall be reduced to the extent necessary to distribute the full capacity of the pipeline system fairly among all of Panhandle's customers. As we have seen, that remedy was expressly rejected by the Commission with respect to the later years here involved.

The Commission concedes, of course, that the proviso of section 7(a) [4] of the Act expressly deprives it of authority to compel the enlargement by a natural gas company of its transportation facilities in connection with the extension or improvement of such facilities. It argues however that this proviso relates only to the extension or improvement of natural gas transportation facilities which the Commission, acting under section 7, directs to be undertaken, and that it does not apply to an order entered by the Commission under section 5(a) directing the elimination by a natural gas company of a discriminatory practice as between existing customers which is prohibited by section 4(b).

█ We cannot accept the narrow construction which the Commission thus seeks to place upon the proviso of section 7(a) of the Act. On the contrary we think that the provisions of section 5(a), which confer upon the Commission power to direct the elimination of unduly discriminatory and preferential practices, must be read in the light of and construed as subject to the proviso in section 7(a) that the Commission may not compel the enlargement of the transportation facilities of a natural gas company. As the Supreme Court said in Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499:

> "If possible all sections of the Act must be reconciled so as to produce a symmetrical whole. We cannot attribute to Congress the intent to grant such far-reaching powers as implicit in the Act when that body has endeavored to be precise and explicit in defining the limits to the exercise of federal power."

█ So here we cannot hold that section 5(a) implicitly confers upon the Commission the power to direct the enlargement of natural gas transportation facilities which Congress by section 7(a) of the Act expressly withheld. An order under section 5(a) directing a pipeline company to deliver more gas than its system has capacity to transport has the inescapable effect of compelling the company to improve its system by its enlargement to the extent necessary to carry the amount of gas required.

decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates." 15 U.S.C.A. § 717d (a).

3. The four noncontracting customers had requested 275,000 Mcf per day and had been allocated 196,049 Mcf per day by the Commission.

4. "Sec. 7. (a) Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any **person or** municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers." 15 U.S.C.A. § 717f(a).

For to improve is to augment or enhance in quantity as well as quality.[5] Such an order is, therefore, the equivalent of an order for the improvement of transportation facilities by their enlargement and as such is expressly within the ban of the proviso of section 7(a). Moreover, even in the absence of the proviso of section 7(a) there might well be a question whether the language of section 5(a) conferred unlimited power upon the Commission to compel a natural gas company to employ additional capital in the enlargement of its transportation facilities. Compare I. C. C. v. U. S. ex rel. City of Los Angeles, 1929, 280 U.S. 52, 50 S.Ct. 53, 74 L.Ed. 163. In the light of Section 7(a) we are compelled to conclude that Congress meant to leave the question whether to employ additional capital in the enlargement of its pipeline facilities to the unfettered judgment of the stockholders and directors of each natural gas company involved.

In Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499, the Supreme Court held that under section 1(b) of the Act the Commission has no jurisdiction over the production or gathering of natural gas. It would seem that Congress intended that the proviso of section 7(a) prohibiting the Commission from requiring the enlargement of transportation facilities for natural gas should be complementary to section 1(b). For if the Commission could require a natural gas company to enlarge its transportation facilities for the purpose of delivering more gas through them, the Commission would be effectively regulating the production and gathering of natural gas. Obviously such enlarged transportation facilities could not deliver additional gas unless it was produced and gathered.

■ It was stated at bar, without contradiction, that since the passage of the Natural Gas Act in 1938 the Commission has never until the present case asserted power to direct a natural gas company to enlarge its transportation facilities or to sell and deliver gas beyond the capacity of such facilities. As the Supreme Court said in Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 513, 69 S.Ct. 1251, 1260, with respect to the attempted exercise by the Commission of power in the field of production and gathering of gas:

"Failure to use such an important power for so long a time indicates to us that the Commission did not believe the power existed."

The Commission urges that its orders here under attack are supported by Michigan Consol. Gas Co. v. Panhandle Eastern Pipe L. Co., 6 Cir., 1949, 173 F.2d 784, 790. That case, however, did not involve the power of the Commission to compel an enlargement of transportation facilities. In that case Panhandle had already voluntarily sought and obtained authority from the Commission to install the facilities in question. Michigan Consolidated sought in an action brought in the district court to compel Panhandle to install a portion of the authorized facilities which would be of particular benefit to it ahead of other portions with which it was not so directly concerned. The Commission, intervening in the district court, contended that it had primary administrative jurisdiction to determine whether Michigan Consolidated's request for priority of installation of that part of the authorized facilities with which it was concerned would result in preference to or discrimination against one customer over another or in preference or discrimination between classes. The Court of Appeals upheld the dismissal of the suit by the district court on this very ground, namely, that "Consolidated has not invoked the authority of the Commission to the full extent of its regulatory powers."

■ We conclude that it was beyond the power of the Commission by Paragraph (E) of its order issued August 31, 1951 accompanying Opinion No. 218 to order Panhandle within 45 days to take steps to eliminate discrimination in the service between the customers on its Liberty lateral and those on its other laterals by enlarging the facilities of the Liberty lateral. Paragraph (E) of the order of August 31, 1951 must

5. Webster's New International Dictionary, 2d Ed., p. 1252.

accordingly be set aside. Likewise we conclude that the Commission was without power by Paragraph (E) of the order issued March 5, 1952 to permit the service agreements between Panhandle and its contracting customers calling for daily maximum deliveries of gas ultimately aggregating 811,634 Mcf to take effect and at the same time by Paragraph (F) of said order to direct Panhandle to provide its four noncontracting customers with maximum daily deliveries of gas aggregating 196,049 Mcf, the total of the two being in excess of the designed capacity of the pipeline system and the total maximum deliveries directed to be made from the Liberty lateral being in excess of the existing capacity of that lateral.

Since the Commission has found that the failure of Panhandle to deliver this amount of gas to its four noncontracting customers would result in undue discrimination against them in favor of its contracting customers and since Panhandle did not in its brief or oral argument in this case ask us to pass upon this finding of discrimination we will set aside both Paragraphs (E) and (F) of the order issued March 5, 1952 in order that the Commission may, if it finds such action appropriate, direct the elimination of any such discrimination by the reduction of the maximum amounts of gas contracted for or claimed by Panhandle's customers to such amounts as will fairly distribute the existing capacity of Panhandle's system among its customers and the existing capacity of the Liberty lateral among the customers served from that lateral.

It will be so ordered.

McLAUGHLIN, Circuit Judge (dissenting).

I cannot agree that the orders of the Commission in these two cases should be reversed. The majority opinion reads the proviso of section 7(a) of the Natural Gas Act as a general limitation on the Commission's powers and not merely on those powers granted by section 7(a). It is stated that while section 5(a) " * * * confer[s] upon the Commission power to direct the elimination of unduly discriminatory and preferential practices * * *" the Commission may not, in asserting this power, compel the enlargement of transportation facilities, and that its orders have " * * * the inescapable effect of compelling the company to improve its system by its enlargement * * *."

The Natural Gas Act was enacted in 1938 and, with one or two minor exceptions not here relevant, has not been amended since that date. It is admittedly in need of revision. One question arising under the Act which requires clarification was posed collaterally in Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784, and is presented here in clearer outline: the limitations on the Commission's power to correct unlawful discrimination. The Sixth Circuit found little, if any, precedent to aid it in determining whether the Commission's power to correct such discrimination, if asserted in such a way as to amount to an order of enlargement within section 7(a), would be beyond its jurisdiction. That court, however, in a well-reasoned opinion answered the question in the negative, thus concluding that the power under section 5(a) to correct discrimination prohibited by section 4(b) is not limited by the proviso of section 7(a).[1] With this conclusion I agree. Were the law otherwise there would in many cases be no effective means of eliminating the unreasonable differences in service and facilities which are forbidden by section 4(b).

The above considerations aside, it would seem from the location of the proviso in section 7(a) that it was meant to apply only to those situations where the Commission, finding "such action necessary or desirable in the public interest * * *" orders a natural gas company "to extend or improve its transportation facilities, to establish physical connection" with the facilities of

---

[1]. Indeed, the court said in 173 F.2d at page 789:

"Whatever may be the limits placed by the Act upon the authority of the Commission in other respects, it is clear that under § 717 c(b) [Section 4(b)] the authority of the Commission, in respect to undue preferences or advantages, is without limitation."

other persons or municipalities, etc. Such orders have nothing to do with correcting or removing unlawful discrimination but deal with cases where *in the public interest* the Commission deems it desirable to extend or improve service. Obviously the draftsmen of the Act deliberately limited the power of the Commission in that type of case where the company's behavior is not subject to a corrective order, while refusing to impose similar restrictions in cases where it is. At any rate, had Congress intended to apply the limitation to all orders of the Commission including those designed to correct discrimination, it could have included similar wording in the proviso of section 5(a), or at least have set out the restriction in a separate section or subsection so that its application to the entire Act would clearly appear.

Even if it be true that the proviso of section 7(a) pervades the entire Act, it is my opinion that the case should be remanded for a determination by the Commission on the question whether what Panhandle will have to do to comply with the orders of the Commission constitutes an improvement or extension on the one hand or an enlargement on the other, particularly as concerns that part of the order dealing with the Louisburg lateral. As the Sixth Circuit, in considering whether the Commission or the courts should decide the question, said in the Michigan Consolidated case, supra, at page 788 of 173 F.2d:

"The first question we have to deal with is whether what Consolidated wants done at the Edgerton Station under command of court decree, constitutes on the one hand a mere extension or improvement, concededly within the power of the Commission to direct, or an enlargement which the Commission may not order. The Act nowhere defines these terms and it is somewhat baffling to determine when and under what circumstances an extension or improvement of facilities ceases to be such and becomes enlargement. Be that as it may, it is nevertheless clear to us that in the contemplation of an integrated facility extending across eight states, whether a few miles of extra pipe constitutes an enlargement or mere improvement, requires consideration of data and of facts and circumstances within the competency of the administrative authority entrusted with regulation rather than within the competency of the court. To inexpert judgment it may seem, without knowledge of such facts and circumstances, that the addition of pipe to an already existing and singly considered pipe-line might well be an extension, even though such pipe-line lies parallel to another and the two constitute a double pipe-line. It is idle to argue that we must accept Consolidated's designation of the construction desired by it at Edgerton as an enlargement, because at the hearing below there was no controversy about it. The Commission here challenges the designation, and in any event, we are dealing with a question of jurisdiction and it is axiomatic that jurisdiction may not be conferred upon a federal court by consent."

By contrast, in reversing, this court assumes that an enlargement has been ordered by the Commission despite the fact that there are no Commission findings as to what must be done to correct the definite existing discrimination on the Louisburg lateral and, of course, no findings either that the remedy, whatever it might be, would constitute an enlargement. More than that, since under Section 7(a) improvements which are enlargements cannot be ordered by the Commission, the majority, by interpreting "improve" to mean the equivalent of "enlarge", has read the former term out of section 7(a), and under its view, out of the entire Act.

### On Petition for Rehearing.

MARIS, Circuit Judge.

■ The Central West Utility Company, an intervenor in this case, has filed a petition for rehearing which calls for brief discussion. Its principal contention is that the inadequacy of the Liberty lateral to deliver the volume of gas which the Commission's order would require Panhandle to deliver to Central West and other

customers served from that lateral is due largely to the fact that Panhandle has allowed the lateral to fall into a condition of decay and disrepair. Central West urges that to the extent that the Commission's orders here under attack require Panhandle to restore the Liberty lateral to the capacity for which it was originally designed and authorized and which it at one time had they are within the Commission's authority. With this contention we agree.

When a natural-gas company, after securing the approval of the Commission, has constructed or acquired a pipeline having a definite designed capacity it has an obligation in the public interest to maintain the pipeline in such good order and repair as to be able to continue to deliver the volume of gas for which it was originally designed and approved. And if it develops that the company can in actual operation safely and feasibly deliver a larger volume of gas through the pipeline than it was designed to carry this obligation of maintenance includes the duty to keep the pipeline in condition to deliver this larger volume of gas. If the company fails in its duty of maintenance the Commission under section 7(a) of the Act, 15 U.S.C.A. § 717f(a), may, if necessary or desirable in the public interest, direct the company to improve its facilities by their rehabilitation and repair, or even reconstruction, to the extent necessary to restore them to their original designed and approved capacity or former actual capacity, as the case may be. For such action would clearly not involve an enlargement of transportation facilities within the ban of the proviso in section 7(a). And the same may well be true of a direction for the use in operating a pipeline of improved facilities which will increase its carrying capacity, provided a physical enlargement of the pipeline itself is not involved.

We adhere, however, to the view expressed in the opinion of the court heretofore filed that the Commission is prohibited by the proviso in section 7(a) from directing an improvement of the transportation facilities of a natural gas company which involves the enlargement of those transportation facilities, even though the purpose is to enable the delivery of more gas in order to eliminate undue discrimination between customers. Whether a given improvement does or does not involve a prohibited enlargement may be a close technical question, however. We agree with the view expressed by our brethren of the Sixth Circuit in Michigan Consol. Gas Co. v. Panhandle Eastern Pipe L. Co., 6 Cir., 1949, 173 F.2d 784, 788, that it is a question which should be passed upon in the first instance by the Commission.

Here the Commission has not passed upon this question, since it took the view that it was empowered by section 5(a) of the Act to order the enlargement of the Liberty lateral by Panhandle regardless of the ban of the proviso in section 7(a), because it thought such action to be necessary to avoid undue discrimination among Panhandle's customers. Its orders in this regard having now been set aside, the Commission will be free to reconsider, in the light of the opinions of this court, the extent to which it may lawfully require Panhandle to improve, and thereby to increase the present capacity of, the Liberty lateral.

The petition for rehearing will be denied.

McLAUGHLIN, Circuit Judge, adheres to the views expressed in his dissenting opinion heretofore filed.